UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

MARVIN BERNSTEIN, Director,                            :
Mental Hygiene Legal Service,                          :
First Judicial Department, and                         :
MICHAEL B., EUGENE C., and                             :
EDDIE L., patients at Kirby Forensic                   :
Psychiatric Facility, on behalf of themselves          :
and on behalf  of all others                           :
similarly situated,                                    :
               Plaintiffs,          :
      -v.-                                      :     05 Civ. 1322 (GEL)(THK)
                                                  :
GEORGE E. PATAKI, in his official capacity as          :
Governor of the State of New York,                     :
SHARON CARPINELLO, in her official capacity            :
 as Commissioner of the                                :
New York State Office of Mental Health,                :
and EILEEN CONSILVIO,                                  :
in her official capacity as Director of Kirby          :
Forensic Psychiatric Facility,                         :
                                                  :
              Defendants.          :

-------------------------------------------------------------X


**Plaintiffs' Memorandum of Law In Opposition to Defendants' Motion to Dismiss**

MARVIN BERNSTEIN, Director
Mental Hygiene Legal Service, First Dept.
<u>Attorneys  for Plaintiffs</u>
60 Madison Avenue, 2nd Floor
New York, New York 10010
Phone:  (212) 779-1734

April 6, 2005

STEPHEN J. HARKAVY
SADIE ZEA ISHEE
     <u>Of Counsel</u>

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    Statutory Scheme Challenged . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

POINT ONE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    WHERE A STATE HAS CREATED A TWO-TIERED SYSTEM OF MENTAL
        HOSPITALS, WHEREIN ONE LEVEL ENTAILS SUBSTANTIALLY
        GREATER RESTRICTIONS ON PATIENTS' LIBERTY THAN THE OTHER,
        A CIVIL PSYCHIATRIC PATIENT HAS A LIBERTY INTEREST, DERIVED
        FROM THE DUE PROCESS CLAUSE OF THE FEDERAL CONSTITUTION,
        IN BEING CONFINED IN THE LESS-RESTRICTIVE FACILITY.
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

POINT TWO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    PLAINTIFFS HAVE A STATE-CREATED LIBERTY INTEREST IN BEING HOUSED
        IN THE LEAST-RESTRICTIVE ENVIRONMENT APPROPRIATE TO THE
        STATE'S TREATMENT GOALS, AND THIS INTEREST IS NOT
        ADEQUATELY PROTECTED BY THE PROCEDURES PROVIDED UNDER
        NEW YORK LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        A. Plaintiffs' state-created liberty interest in receiving psychiatric treatment in the
            least-restrictive possible environment can be undermined by confinement
            in a secure facility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        B.. The New York statutory scheme violates plaintiffs' procedural due process
            rights by providing inadequate procedural protections against an erroneous
            deprivation of plaintiffs' liberty interest . . . . . . . . . . . . . . . . . . . . . . . . . 12

POINT THREE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    BY FAILING TO REQUIRE DEFENDANTS TO PROVE ANY NECESSITY OF
        HOUSING PLAINTIFFS IN A SECURE FACILITY, THE NEW YORK
        STATUTORY SCHEME VIOLATES PLAINTIFFS' SUBSTANTIVE DUE
        PROCESS RIGHT TO BE FREE FROM UNJUSTIFIED INTRUSIONS ON
        THEIR PERSONAL LIBERTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

POINT FOUR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    THE NEW YORK STATUTORY SCHEME VIOLATES THE PLAINTIFFS' EQUAL

PROTECTION RIGHTS BECAUSE IT ARBITRARILY PROVIDES FEWER
PROCEDURAL PROTECTIONS TO THEM THAN TO OTHER CLASSES OF
PATIENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

TABLE OF AUTHORITIES

CASES

Page

*Addington v. Texas*, 441 U.S. 418 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 15

*Aliza K. v. Ford*, 92 N.Y.2d 500 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Baxstrom v. Herold*, 383 U.S. 107 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Benjamin v. Fraser*, 264 F.3d 175 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Buthy v. Commissioner*, 818 F.2d 1046 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

*Charles W. v. Maul*, 214 F.3d 350 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 21

*Chavez v. Martinez*, 538 U.S. 760 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Consilvio v. Michael B.*, 307 A.D.2d 852 (1st Dep't 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Covington v. Harris*, 419 F.2d 617 (D.C. Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Dorsey v. Solomon*, 604 F.2d 271 (4th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Eternity Global Master Fund, Ltd. v. Morgan Guaranty Trust Co. of N.Y.*, 375 F.3d 168 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Fetterusso v. State of New York*, 898 F.2d 322 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . 21

*Foucha v. Louisiana*, 504 U.S. 71 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 15

*Francis S. v. Stone*, 221 F.3d 100 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Giano v. Selsky*, 238 F.3d 223 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Hewitt v. Helms*, 459 U.S. 460 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Ingraham v. Wright*, 430 U.S. 651 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Jackson v. Indiana*, 406 U.S. 715 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Johnson v. Brelje*, 701 F.2d 1201 (7th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

i

*Jones v. United States*, 463 U.S. 354 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 22

*Kesselbrenner v. Anonymous*, 33 N.Y.2d 161 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 11

*Kulak v. City of New York*, 88 F.3d 63 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Mathews v. Eldridge*, 424 U.S. 319 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14, 16

*Matter of David B.*, 97 N.Y.2d 267 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Maust v. Headley*, 959 F.2d 644 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Meachum v. Fano*, 427 U.S. 215 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Morgan v. Rabun*, 128 F.3d 694 (8th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Ortiz v. McBride*, 380 F.3d 649 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*P.C. v. McLaughlin*, 913 F.2d 1033 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*People v. Ortega*, 127 Misc. 2d 717 (Sup. Ct. Bronx Cnty. 1985) . . . . . . . . . . . . . . . . . . . . . 11

*Project Release v. Prevost*, 722 F.2d 960 (2d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

*Sandin v. Conner*, 515 U.S. 472 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Savastano v. Nurnburg*, 77 N.Y.2d 300 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Seling v. Young*, 531 U.S. 250 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Society for Good Will to Retarded Children v. Cuomo*, 737 F.2d 1239 (2d Cir. 1984) . . . . . . . . 8

*Theilman v. Leean*, 282 F.3d 478 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Vitek v. Jones*, 445 U.S. 480 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Washington v. Glucksberg*, 521 U.S. 702 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Youngberg v. Romeo*, 457 U.S. 307 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7

*Zinermon v. Burch*, 494 U.S. 113 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## STATUTES

14 N.Y.C.R.R. § 36.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

14 N.Y.C.R.R. § 517 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

C.P.L. § 730.40 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

MHL § 9.33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

N.Y. C.P.L.R.  Article 78 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

N.Y. M.H.L. § 7.07 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

N.Y.C.P.L. § 330.20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6

## MISCELLANEOUS

Webster's New College Dictionary (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

PRELIMINARY STATEMENT

This memorandum is submitted by MARVIN BERNSTEIN, as Director of Mental

Hygiene Legal Services, First Judicial Department, on behalf of named plaintiffs MICHAEL B.,

EUGENE C., and EDDIE L. ("plaintiffs"), in opposition to the motion to dismiss their complaint

pursuant to Fed. R. Civ. P. 12(b)(6), which was filed by defendants GEORGE E. PATAKI,

SHARON CARPINELLO, and EILEEN CONSILVIO ("defendants") on March 23, 2005.

STATEMENT OF FACTS

Plaintiffs are involuntarily committed psychiatric patients who reside at Kirby Forensic

Psychiatric Facility ("Kirby"), a secure psychiatric facility (the more restrictive of the two types

of civil psychiatric facilities operated in New York State). *See* Complaint ("C.") ¶ 1.  Plaintiffs

were placed at Kirby at the direction of the New York State Office of Mental Health ("OMH")

after being found unfit to stand trial on criminal charges for "misdemeanors or low-level

felonies." *See* Defendants' Memorandum of Law in Support of Motion to Dismiss ("Def.

Mem.") at 1.  Plaintiffs, acting on behalf of themselves and all others similarly situated,[1]

challenge the statutory scheme which permits them to be civilly retained at Kirby under New

York Mental Hygiene Law § 9.33 after the criminal charges against them have been dropped, on

the grounds that the scheme deprives them of their due process and equal protection rights.  C.

¶ 1.

Because defendants' recitation of facts fails to provide a clear understanding of the

procedural mechanisms by which these plaintiffs' involuntary civil psychiatric commitment was

---

[1]Plaintiffs expect to file a motion for class certification upon resolution of the instant
motion to dismiss.

effectuated, a description of the statutory scheme at issue is necessary:

Statutory Scheme Challenged

New York operates two types of civil psychiatric facilities for involuntary patients, described in the state statutory scheme as "secure" and "non-secure" facilities. C. ¶ 6. Secure facilities, including Kirby, replaced the older forensic psychiatric facilities operated by the New York Department of Correctional Services, and are significantly more restrictive than non-secure facilities. C. ¶¶ 6, 7, 9. They are intended for the confinement of the most dangerous individuals within the New York mental health system. C. ¶ 9. The determination of whether these plaintiffs will be placed in a secure facility– in which all patients are subjected to greater physical restraints, regardless of their behavior– or in a non-secure facility– which represents a "step down" in restrictiveness under the New York scheme– is in the sole discretion of the Commissioner of OMH. *See* N.Y. C.P.L. § 730.40(1); C. ¶¶ 7, 9, 11, 12.

When a New York criminal court determines that a person is unfit to stand trial on a misdemeanor or minor felony charge, that court issues an "order of observation" committing that person to the custody of OMH "for care and treatment in an appropriate institution." N.Y. C.P.L. § 730.40(1); C. ¶ 11. Within 24 hours of the issuance of such an order, someone within the OMH designates the particular civil psychiatric facility to which the person will be committed. C. ¶ 12. After patients are committed to OMH custody pursuant to § 730.40, the criminal charges against them are dropped.[2] C. ¶ 1, 14. Thereafter, the OMH cannot continue to

---

[2]Where the pending criminal charge is a misdemeanor, criminal charges are dropped immediately when the patient is referred to OMH custody. Where the pending criminal charge is a minor felony, the criminal charges are dropped if the patient has not regained capacity within 90 days of his commitment to OMH custody. *See* C. ¶ 14; N.Y. C.P.L. § 730.40.

retain these patients involuntarily in any hospital unless it can show that they meet the minimum criteria for involuntary civil commitment: that is, they must at least be mentally ill and in need of involuntary care and treatment. C. ¶¶ 15-16.

In New York, civil commitment is effectuated under Mental Hygiene Law (MHL) § 9.33, which places the burden of proof on the Commissioner to show that a patient is mentally ill and in need of retention.  A patient has the right to a judicial hearing under § 9.33, and an initial civil commitment under § 9.33 is valid for up to six months; thereafter, the hospital must make subsequent periodic § 9.33 applications, with attendant judicial review, to authorize the patient's continued retention.  C. ¶ 17.

Nothing in the text of § 9.33 addresses the question of a patient's commitment to a secure as versus a non-secure, facility. C. ¶ 18.  However, the New York Appellate Division, First Department, recently held that a § 9.33 hearing court cannot direct a patient's transfer from a secure facility to a non-secure facility.  *Consilvio v. Michael B.*, 307 A.D.2d 852, 853-54 (1st Dep't 2004).  The decision alerted the plaintiffs to the fact that the New York statutory scheme permits patients in the plaintiffs' situation to be housed at Kirby even absent any showing of a higher level of dangerousness– "dangerous mental disorder," in the terminology of New York law– to support their restrictive detention. C. ¶¶ 9, 22, 24.  Furthermore, § 9.33 hearing courts are no longer empowered to direct these patients' transfer to a non-secure facility, even if the testimony at a § 9.33 hearing indicates that the patient is not so dangerously mentally ill as to require secure retention or that his mental illness could be adequately treated in a less-restrictive setting.  C. ¶¶ 22-23.

In contrast to the § 9.33 patients at Kirby, patients who have been found not responsible

3

for a crime by reason of mental disease or defect ("NGRMDD") cannot be confined there (or in any secure facility) unless the state has proven to the court's satisfaction that the patient is suffering from a "dangerous mental disorder," a term of art under New York law that denotes a heightened level of dangerousness.  C. ¶ 25; N.Y. Crim. Proc. L. §§ 330.20(1)(c), (6)-(9).  If an NGRMDD patient is found to remain mentally ill and dangerous but not to suffer from the heightened "dangerous mental disorder," the court must direct his transfer to a non-secure setting.  C. ¶ 26.

Plaintiffs challenge this statutory scheme to the extent that the state is not required to prove the plaintiffs' need for retention in a secure facility, rather than a less restrictive, non-secure institution, and that § 9.33 hearing courts are not permitted to direct patients' transfer to a non-secure institution, even if the testimony at such a hearing indicates that a patient is not so dangerously mentally ill that he requires secure retention or that his mental illness could be adequately treated in the less-restrictive setting.  C. ¶ 1.

ARGUMENT

Standard of Review

A court's task in reviewing a Rule 12(b)(6) motion to dismiss is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."  *Eternity Global Master Fund, Ltd. v. Morgan Guaranty Trust Co. of N.Y.,* 375 F.3d 168, 176 (2d Cir. 2004)(citation omitted).  A court must draw all possible facts and inferences in the plaintiffs' favor and may dismiss the complaint only if it "appears to a certainty that plaintiff is entitled to no relief."  *Id.*  This is an "indulgent standard" that reflects the liberal pleading requirements of the Federal Rules of Civil Procedure.  *Id.*

POINT ONE

WHERE A STATE HAS CREATED A TWO-TIERED SYSTEM OF MENTAL HOSPITALS, WHEREIN ONE LEVEL ENTAILS SUBSTANTIALLY GREATER RESTRICTIONS ON PATIENTS' LIBERTY THAN THE OTHER, A CIVIL PSYCHIATRIC PATIENT HAS A LIBERTY INTEREST, DERIVED FROM THE DUE PROCESS CLAUSE OF THE FEDERAL CONSTITUTION, IN BEING CONFINED IN THE LESS-RESTRICTIVE FACILITY.

To state a claim for a violation of procedural due process, a plaintiff must demonstrate "(1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (*citing Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001)). Defendants here claim only that plaintiffs have no federally-derived liberty interest in being confined in the less-restrictive of the two types of mental hospitals operated in New York State; they make no contention that, if such a liberty interest does, in fact, exist, the New York procedures to protect against an erroneous deprivation of that interest are constitutionally sufficient. *See* Def. Mem. at 5-8. Thus, to defeat defendants' Rule 12(b)(6) motion, plaintiffs need only demonstrate that such a liberty interest exists.

Defendants concede that the substantive aspects of the due process clause of the United States Constitution can be the source of individual liberty interests. Def. Mem. at 6. In this case, the restrictions on personal liberty experienced by patients in secure psychiatric facilities, which are substantially greater than the limitations experienced by patients in non-secure facilities, implicate a liberty interest in freedom from bodily restraint. "Liberty from bodily restraint has always been recognized as the core of the liberty interest protected by the Due Process Clause from arbitrary governmental action." *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982)(internal citation omitted). An individual's interest in personal liberty is a basic right protected by the Due Process Clause. *See Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)("We have always been careful

5

not to minimize the importance and fundamental nature of the individual's right to liberty.")(citation omitted).

Patients in secure facilities are subject to greater physical restraints, regardless of their behavior, than patients in non-secure facilities. C. ¶ 7. Secure facilities are intended for the confinement of the most dangerous individuals: those who are suffering from "dangerous mental disorders." C. ¶ 9; N. Y. C.P.L. § 330.20 (1)(c); *Matter of David B.*, 97 N.Y.2d 267, 278 (2002). The New York Court of Appeals has described the non-secure facilities as a "step[] down," and a "less restrictive mode[] of confinement" than a secure facility. *Id.* The very fact that the state has created two distinct types of mental institutions, one of which is substantially more restrictive than the other, gives rise to a patient's liberty interest in being confined in the less-restrictive facility. *See*, *e.g.*, Webster's New College Dictionary (2001)(defining "liberty" as "[t]he state of being free from control or restriction.").

The Supreme Court has held that a *criminal conviction* extinguishes this liberty interest to the extent that a prisoner has no constitutional liberty interest in being confined in a medium-security, rather than a maximum-security facility. *Meachum v. Fano,* 427 U.S. 215, 224 (1976)("the [prisoner's] conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons."). But, as the Second Circuit has explained, the *Meachum* decision is "grounded in the idea that *conviction* extinguishes liberty interests." *Benjamin v. Fraser*, 264 F.3d 175, 189 (2d Cir. 2001)(emphasis added). Thus, the Second Circuit concluded, non-prisoners retain a liberty interest in freedom from bodily restraint which precludes the imposition of heightened restraint status on them in the absence of minimally-adequate procedural protections. *Id.* at 188-89 (finding post-deprivation procedural

protections sufficient to protect liberty interest of pre-trial detainees in freedom from "restraint status"). Like the pre-trial detainees in *Benjamin*, the plaintiffs here have never been convicted of a crime, and therefore, their interest in freedom from bodily restraint has not been extinguished. Furthermore, because the secure psychiatric facility, like the maximum-security prison at issue in *Meachum*, imposes greater restraints on individuals' liberty than a state-created alternative, placement in that facility implicates a basic liberty interest.

Indeed, the New York Courts have consistently recognized that civil psychiatric patients, like the plaintiffs in this case, have a liberty interest in being placed at a less-restrictive, non-secure facility rather than a more-restrictive, secure facility. *See Aliza K. v. Ford*, 92 N.Y.2d 500, 507 (1998)("Unlike [a non-secure facility], all patients at Kirby are subject to heightened security irrespective of their conduct. . . . Thus, [a patient's] transfer implicates a liberty interest which triggers rights to procedural due process.");[3] *see also Kesselbrenner v. Anonymous*, 33 N.Y.2d 161, 165 (1973). While the federal courts are in no way bound by the state courts' conclusion that a liberty interest is implicated by the state's creation of a two-tiered system of psychiatric hospitals, "[s]tate court decisions, like the decisions of other federal lower courts, are relevant and often persuasive" in the federal context. *Charles W. v. Maul*, 214 F.3d 350, 357 (2d

---

[3]The defendants contend that the only liberty interest recognized by the New York Court of Appeals in *Aliza K.* "does not apply to Plaintiffs' situation" because it was created by the existence of state regulations providing particular procedural mechanisms to guide the transfer of civil patients from a non-secure to a secure hospital in an emergency situation. Def. Mem. at 11. Yet the liberty interest recognized in *Aliza K.* was, as the Court of Appeals stated, derived from the more-restrictive environment in the secure facility, coupled with the enhanced stigma of being placed there. *Aliza K.*, 92 N.Y.2d at 506-07. Both stigma and restrictions on freedom of movement are elements of the personal liberty protected by the federal constitution. *See Vitek v. Jones*, 445 U.S. 480, 491-93 (1980)(stigma associated with psychiatric commitment implicates liberty interest); *Youngberg*, 457 U.S. at 316 (freedom of movement is a protected liberty interest).

7

Cir. 2000).

As defendants properly recognize, the constitution permits variance between states as to the procedural protections that must accompany civil psychiatric commitment. Def. Mem. at 6-7 (*citing Addington v. Texas*, 441 U.S. 418, 431 (1979)). But the liberty interest here at stake is a product of precisely that selfsame variance: by creating two types of psychiatric hospitals, with one type substantially less restrictive than the other, New York has ensured that its psychiatric patients have a liberty interest in residing in the less-restrictive facility. The state must therefore provide procedural protections to its patients that sufficiently protect against an erroneous deprivation of this interest.[4] Defendants' Rule 12(b)(6) motion should therefore be denied and further inquiry should be conducted into the scope and the nature of the procedural protections required.

---

[4]Some courts have described the federal Due Process Clause as protecting the civilly committed mental patient's liberty interest in "the least restrictive alternative"– that is, in being confined in the least restrictive setting appropriate to the patient's medical needs and treatment goals. *See*, *e.g.*, *Covington v. Harris*, 419 F.2d 617, 623 (D.C. Cir. 1969). The Second Circuit has rejected this view. *See Kulak v. City of New York*, 88 F.3d 63, 73 (2d Cir. 1996); *P.C. v. McLaughlin*, 913 F.2d 1033, 1042 (2d Cir. 1990); *Society for Good Will to Retarded Children v. Cuomo*, 737 F.2d 1239, 1247-49 (2d Cir. 1984). These plaintiffs do not assert a federal right, stemming from the substantive aspects of the due process clause, in a "least restrictive alternative;" rather, they contend only that where a state has created a two-tiered system for housing its mentally ill, with one tier entailing substantially greater restrictions on a patient's liberty than the other, a liberty interest arises in being confined in the less-restrictive setting. As noted above, the liberty interest asserted here derives from the interest in "freedom from undue bodily restraint," *Youngberg*, 457 U.S. at 316, an interest which explicitly survived *Society for Good Will* and its progeny, *see Society for Good Will*, 737 F.2d at 1246-47.

POINT TWO

PLAINTIFFS HAVE A STATE-CREATED LIBERTY INTEREST IN BEING HOUSED IN
THE LEAST-RESTRICTIVE ENVIRONMENT APPROPRIATE TO THE STATE'S
TREATMENT GOALS, AND THIS INTEREST IS NOT ADEQUATELY PROTECTED BY
THE PROCEDURES PROVIDED UNDER NEW YORK LAW.

A.  Plaintiffs' state-created liberty interest in receiving psychiatric treatment in the least-
restrictive possible environment can be undermined by confinement in a secure facility.

     "[S]tates may under certain circumstances create liberty interests which are protected by

the Due Process Clause." *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995). The Second Circuit

has observed that state regulations, statutes, or mandatory court orders may be found to have

created a liberty interest, possessed by involuntary psychiatric patients like the plaintiffs in this

case, in being treated in the least restrictive setting in which the patient's treatment can be

properly effectuated.  *See Kulak v. City of New York*, 88 F.3d 63, 73 (2d Cir. 1996) (citation

omitted); *see also Hewitt v. Helms*, 459 U.S. 460, 472 (1983)(liberty interest may be created

where state law or regulation contains "explicitly mandatory language in connection with

requiring specific substantive predicates.").

     Defendants contend that plaintiffs cannot establish a state-created liberty interest in the

procedures attendant to their placement in a secure rather than a non-secure facility because no

written, formal procedures exist to guide the OMH in designating which patients will be directed

to each type of facility.  Def. Mem. at 9-10.  But New York's regulatory scheme expressly

recognizes that an involuntary psychiatric patient has a civil right to be placed in the least

restrictive environment within which his treatment goals can be addressed.  *See* 14 N.Y.C.R.R.

§ 36.1 ("The civil rights of mentally disabled persons require that such person be treated and

served in the least restrictive setting possible in which treatment or service goals can be met."). This language is mandatory in its use of the word 'require,' a verb which imposes an affirmative duty on those whose behavior it governs. *See*, *e.g*, *Hewitt*, 459 U.S. at 471-72 (terms such as "shall," "will," and "must" impose mandatory requirements). It is the mandatory directive that patients be housed in the least-restrictive setting consistent with treatment goals that creates the liberty interest in question. Furthermore, this liberty interest continues through the duration of each patient's OMH custody, imposing an affirmative obligation on OMH to ensure that each patient continues to be housed in the least restrictive setting appropriate to his or her changing treatment needs.

Faced with remarkably similar language in an Illinois statute which stated that patients "shall be provided with adequate and humane care and services in the least restrictive environment, pursuant to an individual services plan," the Seventh Circuit found the language sufficient to create a liberty interest which could not be infringed absent due process protections. *Johnson v. Brelje*, 701 F.2d 1201, 1205 (7th Cir. 1983).[5] The two statutes are alike in their imposition of a mandatory assessment of the least restrictive environment appropriate to each patient's service needs. Thus, they should be interpreted alike insofar as their creation of a patient's liberty interest in being housed in the least restrictive environment consistent with his

---

[5]The Illinois legislature later amended its statutory scheme in a manner that revokes this entitlement to least restrictive environment for persons found unfit to stand trial. *See Maust v. Headley*, 959 F.2d 644, 647 (7th Cir. 1992). These later legislative changes do not alter the Seventh Circuit's holding that the above-quoted language is sufficiently mandatory to confer an affirmative, state-created liberty interest.

10

treatment goals.[6]

The mandatory nature of the "least restrictive alternative" requirement under New York law is reinforced by N.Y. M.H.L. § 7.07(c), which assigns to the OMH mandatory responsibility for ensuring "that the personal and civil rights of persons receiving care, treatment, and rehabilitation are adequately protected."  Because the New York regulations characterize the "least restrictive alternative" requirement as an essential element of the civil rights of mentally disabled persons, see 14 N.Y.C.R.R. § 36.1, Section 7.07, read in tandem with 14 N.Y.C.R.R. § 36.1, is "unmistakably mandatory" in charging the OMH with the protection of each patient's right to a least restrictive treatment setting. Indeed, the New York Court of Appeals has held that statutes governing the involuntary commitment of civil psychiatric patients *must* be read to provide for such a "least restrictive alternative" so as not to be constitutionally infirm. *Kesselbrenner*, 33 N.Y.2d at 167.  Indeed, the OMH itself continues to recognize this affirmative obligation by including language in its boilerplate § 9.33 applications stating that the retention sought is the "least restrictive alternative" suitable for the patient's needs.

Nevertheless, as demonstrated by the experience of one of the named plaintiffs, Michael

---

[6]Courts are currently split as to whether psychiatric patients alleging the deprivation of a state-created liberty interest must show, in addition to mandatory statutory language, that the deprivation alleged is "atypical and significant" compared with ordinary life in a psychiatric facility.  *Compare Theilman v. Leean*, 282 F.3d 478, 483 n.1 (7th Cir. 2002)(like prisoners, psychiatric patients must show that deprivation of liberty alleged is "atypical and significant"); *with Morgan v. Rabun*, 128 F.3d 694, 699 (8th Cir. 1997).  The Second Circuit has not decided whether psychiatric patients alleging a deprivation of a state-created liberty interest must make an additional showing that the deprivation is atypical and significant.  Nevertheless, however, the greater physical restrictions, increased stigma, and the "premium placed on security, confinement, and prevention of escapes" in secure facilities, *see People v. Ortega*, 127 Misc. 2d 717, 728 (Sup. Ct. Bronx Cnty. 1985) are atypical and significant burdens compared to non-secure confinement.

B., OMH's current practices do not always involve assigning patients to the least restrictive facility recommended by their treating doctors. At Mr. B.'s retention hearing in November 2002 and again at his subsequent retention hearing in December 2004, his treating psychiatrists testified unequivocally that Mr. B.'s mental illness could adequately be managed in a non-secure facility. C. ¶¶ 29-30. Regardless, for that entire period, over two years in duration, OMH continued to retain Mr. B. at Kirby, a secure facility. *Id.* To the extent that treating psychiatrists are not entitled to effectuate their patients' transfer to a least-restrictive setting without OMH approval, the situation may arise, as in Mr. B.'s case, where the state-created liberty interest in being housed in a least-restrictive setting is coextensive with transfer to a non-secure facility. In such a case, adequate procedural protections are necessary to guard against an erroneous deprivation of the liberty interest.

B.. <u>The New York statutory scheme violates plaintiffs' procedural due process rights by providing inadequate procedural protections against an erroneous deprivation of plaintiffs' liberty interest.</u>

Normally, once the existence of a liberty interest has been established, the adequacy of the procedural protections that accompany a deprivation of that interest are evaluated using a three-factor balancing test, weighing:

> "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the substitute or additional procedural requirements would entail."

*Mathews v. Eldridge*, 424 U.S. 319, 334 (1976). So long as the procedures provided by the state are adequate, no constitutional violation will be deemed to have occurred. *Id.* Here, without

engaging in this balancing, defendants contend that "New York's post-deprivation process adequately protects" any liberty interest that the plaintiffs may possess under state law.  Def. Mem. at 13-14.

The "post-deprivation process" that defendants rely upon is a regulation, 14 N.Y.C.R.R. § 517, which provides a means for patients to be transferred from one psychiatric facility to another for reasons such as proximity to loved ones, overcrowding in particular facilities, or the availability of certain services in a particular hospital.  *See* 14 N.Y.C.R.R. § 517.4 (d) (listing criteria for transfer); *Savastano v. Nurnburg*, 77 N.Y.2d 300 (1990)(upholding constitutionality of provision as applied to transfer of patients between non-secure facilities against their wishes). Defendants claim that plaintiffs could seek transfer to a non-secure facility under § 517 and that this, coupled with the availability of judicial review pursuant to Article 78 if the patient's request for transfer is denied, provides sufficient procedural protection.  *See* Def. Mem. at 14.

However, the exhaustive list of criteria to be considered in undertaking a § 517 transfer makes no mention of dangerousness, which strongly suggests that the provision was not intended to be used as a mechanism for transfer between secure and non-secure hospitals.[7]  Furthermore, as a practical matter, transfer to a non-secure facility under § 517 is unavailable to the plaintiffs in this case.  This is because, as a prerequisite to even applying for transfer under that provision, a patient must obtain the written consent of the facility to which he wishes to be transferred.  *See*

_____

[7]14 N.Y.C.R.R. § 517.1 explicitly states that patients at Mid-Hudson Psychiatric Center, the only secure psychiatric facility other than Kirby operated by OMH, cannot apply for transfer under § 517.  Mid-Hudson patients are not joined as plaintiffs in this appeal, but under defendants' interpretation of the New York statutory scheme, they would be entitled to no "post-deprivation process" whatsoever, as they are not entitled to proceed under § 517.  The explicit exclusion of Mid-Hudson patients from relief under § 517 suggests that the regulation was intended only for patients in non-secure facilities.

13

14 NYCRR § 517.4 (b)(vii) (providing that patient's application for transfer must contain written consent of receiving hospital). Given that OMH operates both the secure and the non-secure facilities, no non-secure facility would grant such written consent to a patient whom the OMH had assigned to a secure facility. Additionally, judicial review pursuant to Article 78 is not available until an official application under § 517 has been filed and denied, which, in light of the problems with filing such an application, renders that review effectively unavailable as well. Because these plaintiffs cannot use § 517 to obtain transfer to a non-secure facility, any claim that this "post deprivation process" is sufficient to allay due process concerns is meritless.

Even if these plaintiffs could conceivably obtain transfer to a less-restrictive facility using the mechanism provided by § 517, that mechanism, evaluated under the *Mathews v. Eldridge* balancing test, is insufficient to protect the patients' liberty interest. The high risk of an erroneous deprivation under the State's current practices, coupled with the minimal burden that the State would incur by providing additional protections, establish that the scheme fails to satisfy the constitutional standards of procedural due process.

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Matthews v. Eldridge*, 424 U.S. at 333 (citation omitted). To determine whether a statute affords such process as is due, courts must look to the statutory scheme as a whole, focusing on the existence (or lack thereof) of such procedural protections as "the availability of hearings, counsel, and periodic status review." *Project Release v. Prevost*, 722 F.2d 960, 975 (2d Cir. 1983) (statute is adequate to satisfy procedural due process minima where it provides "layers of professional and judicial review" including notice and a judicial hearing within five days of demand). The New York system permits a patient to be

14

assigned to a secure facility initially based solely upon on the conclusions of an anonymous decision-maker arrived at on the basis of undisclosed criteria, prior to which the patient is afforded no opportunity to proffer evidence in support of his position. After this initial decision, New York law provides for a judicial hearing, and subsequent periodic judicial review, on the question of whether a patient continues to need involuntary psychiatric retention *at all.* However, none of these automatic judicial procedures encompass consideration of the question of whether the patient requires care and treatment *in a secure facility*. The "layers of review" that are a hallmark of adequately protective procedures are notably absent here.

By making a patient-initiated administrative procedure the sole means of challenging an erroneous placement in a secure facility, the New York statutory scheme unreasonably shifts the burden of proof onto the patient to prove his suitability for confinement in a less restrictive setting, rather than requiring the hospital to prove that the greater curtailments of his liberty are justified. In *Addington v. Texas*, 441 U.S. 418, 425 (1979), the Supreme Court held that because of the risk of an erroneous deprivation, an involuntary psychiatric commitment will violate the substantive aspects of the due process clause unless the state bears the burden of proving the individual's need for confinement by clear and convincing evidence. The same logic caused the Court, in *Foucha v. Louisiana*, 504 U.S. 71, 81-82 (1992), to invalidate a statute that required commitment of insanity acquittees who could not meet the burden of proving their lack of dangerousness.

Like the statutes at issue in *Addington* and *Foucha*, New York's statutory scheme invites erroneous deprivations by shifting the burden onto the patient to prove that even if his hospitalization is warranted, he is not so dangerous as to require confinement in a secure facility.

15

In fact, New York's statutory scheme goes even further: the only judicial review of a denial of transfer that is available to these plaintiffs is an application under N.Y. C.P.L.R. Article 78, pursuant to which a fact-based administrative decision will be overturned only if it was "arbitrary and capricious or an abuse of discretion." N.Y. C.P.L.R. § 7803(3). Thus, the patient shoulders the burden of proving more than mere error, and the attendant risk of an erroneous deprivation rises accordingly.

The risk of erroneous deprivations is further compounded by the scant procedural protections surrounding the initial determination as to the patient's security placement, which occurs without a hearing, notice, an opportunity to present evidence, or objective criterion upon which the decision is based. The State cannot thereafter require the patient to bear the burden of proving that the result of that decision was in error. As once court has observed, "[w]hile it is proper to place this burden [of proof] on inmates committed in accordance with constitutionally adequate procedures, it is fundamentally unfair to require inmates whom the state has never proven committable to bear the burden of proving their suitability for release." *Dorsey v. Solomon*, 604 F.2d 271, 274 (4th Cir. 1979).

Defendants contend that "it would not be possible for Defendants to provide Plaintiffs with a meaningful review of their placement" in the 24 hours within which OMH must make that placement decision. Def. Mem. at 12, n.2. Indeed, given that the administrative burden imposed on the state is one factor relevant to the question of what procedural protections are due, *see Mathews*, 424 U.S. at 334, plaintiffs do not claim that they are entitled to a pre-placement hearing. Rather, plaintiffs claim only that New York's statutory scheme must be given a constitutional construction by permitting a the question of a patient's appropriate security

16

placement to be considered in every judicial hearing which would arise in the context of a patient's Article 9 retention. One example would be the periodic § 9.33 hearings held to evaluate patients' continuing need for retention.  Because these periodic § 9.33 retention hearings to determine a patient's continuing need for psychiatric commitment are built into New York's statutory scheme, reading consideration of the patient's security placement into the statute would be one means to protect against unnecessary curtailment of a patient's liberty. As the Second Circuit has noted, regular status review is one hallmark of a statutory scheme that comports with procedural due process.  *Project Release*, 722 F.2d at 975.

Additionally, the Government would incur little additional expense by providing this additional procedural protection because the security question can be addressed within the confines of the hearing that is already being held; no new proceeding needs to be instituted. Indeed, the state conserves resources by permitting consideration of the security placement in these proceedings, rather than forcing a patient to institute a new administrative proceeding when he wishes to contest his security placement.  *See*, *e.g.*, *Jones v. United States*, 463 U.S. 354, 366 (1983)(noting that government generally has a strong interest in avoiding *de novo* hearings).

In light of these outstanding questions as to the extent of procedural protections necessary to guard the plaintiffs' state-created liberty interest, this Court should deny defendants' motion to dismiss and require them to answer the plaintiffs' complaint.

### POINT THREE

BY FAILING TO REQUIRE DEFENDANTS TO PROVE ANY NECESSITY OF HOUSING PLAINTIFFS IN A SECURE FACILITY, THE NEW YORK STATUTORY SCHEME VIOLATES PLAINTIFFS' SUBSTANTIVE DUE PROCESS RIGHT TO BE FREE FROM UNJUSTIFIED INTRUSIONS ON THEIR PERSONAL LIBERTY.

Defendants acknowledge that substantive due process places limits on government's authority to engage in "certain arbitrary, wrongful . . . actions."  Def. Mem. at 15 (*citing Zinermon v. Burch*, 494 U.S. 113, 125 (1990)).  However, they contend that plaintiffs have stated no substantive due process claim because the arbitrary government action complained of– the state's failure to provide a substantive standard to govern the placement of civil patients in secure psychiatric facilities– is an "executive action" which must "shock the conscience" if it is to entitle plaintiffs to relief.  Def. Mem. at 16.

Plaintiffs' complaint is not with any particular executive action; they do not complain that OMH or any of its officers acted arbitrarily in assigning any particular patient to Kirby rather than a non-secure facility.  Rather, plaintiffs' complaint is directed to the New York statutory scheme, which provides no substantive standard to govern which patients will be housed in the secure facility and does not require the defendants to prove that secure detention is necessary to the treatment goals underlying  plaintiffs' detention.  C. ¶¶ 53-54.  The "conscience-shocking" test urged by defendants simply does not apply to plaintiffs' claim.  Rather, where a claimed substantive due process violation is grounded in legislative action, rather than a particular executive action, the proper inquiry is: (1) whether the claimed violation involves "governmental interference with . . .fundamental rights and liberty interests, *see Washington v. Glucksberg*, 521 U.S. 702, 720 (1997); and, if so, (2) whether the infringement is "narrowly tailored to serve a compelling state interest," *see Chavez v. Martinez*, 538 U.S. 760, 775 (2003).

Protection under this test is generally accorded to "fundamental rights and liberties which are deeply rooted in this nation's history and tradition and implicit in the concept of ordered

liberty." *Id.* (citations omitted).[8]  "Among the historic liberties [protected by the Due Process

Clause] was a right to be free from and to obtain judicial relief for unjustified intrusions on

personal security." *Ingraham v. Wright*, 430 U.S. 651, 673 (1977).  At a minimum, due process

has always required that the "nature and duration" of a state's detention of an individual "bear

some reasonable relation to the purpose for which the individual is detained." *Jackson v.

Indiana*, 406 U.S. 715, 738 (1972); *see also Seling v. Young*, 531 U.S. 250, 265 (2001).

Plaintiffs' complaint is that this fundamental right is burdened by the defendants' failure to

provide any standard to determine whether the "nature" of their detention– that is, commitment

in a highly restrictive secure facility– bears any relationship to the treatment goals asserted by the

state.

　　　That the New York statutory scheme is not "narrowly tailored to serve a compelling state

interest" is obvious from the defendants' mere recitation of the categories of patients normally

housed in secure facilities.  *See* Def. Mem. at 2-3.  Plaintiffs are the sole class of patients, of the

four categories of patients enumerated there, that New York permits to be placed in secure

facilities without any showing that their alleged heightened dangerousness would justify this

intrusion on their personal liberty.  *Id.*  Other classes of patients can be placed at Kirby only if

they are found to suffer from a  "dangerous mental disorder," or if they have been found to be

"too dangerous to be maintained at a less-secure hospital." *Id.*　 In contrast, plaintiffs can be

placed at Kirby based solely on OMH's designation that Kirby is an "appropriate institution,"

---

[8]While the Supreme Court has engaged in internal debate as to whether the substantive
due process clause might protect some "fundamental rights and liberties" which are *not* "deeply
rooted in this nation's history," *see, generally, Chavez*, 538 U.S. 760, there is no dispute that
rights which *are* "deeply rooted" are entitled to such protection.  *Id.* at 775.

with no individualized showing of heightened dangerousness. C. ¶¶ 11-13. Given that no alleged "compelling interest" prevents the state from demonstrating that secure detention is necessary to the treatment of these other categories of patients, there can be no compelling interest served by denying a similar protection to these plaintiffs.

Because plaintiffs' allegations are sufficient to state a claim for a violation of their substantive due process rights, defendants' motion to dismiss should be denied.

POINT FOUR

THE NEW YORK STATUTORY SCHEME VIOLATES THE PLAINTIFFS' EQUAL
PROTECTION RIGHTS BECAUSE IT ARBITRARILY PROVIDES FEWER PROCEDURAL
PROTECTIONS TO THEM THAN TO OTHER CLASSES OF PATIENTS.

In contrast to civil patients like the plaintiffs in this case, those who enter New York's mental health system through criminal commitments (after being found NGRMDD) may only be placed at Kirby (or any other secure psychiatric facility) if a court concludes that they are suffering from the heightened level of dangerousness known as a "dangerous mental disorder." C. ¶ ¶ 9; 25-26. These NGRMDD patients are also entitled to regular judicial review of the state's decision to continue their detention in a secure facility and must be transferred to a less-secure setting if they are ever found to lack the heightened dangerousness of a "dangerous mental disorder." *See* C. ¶ 26; Def. Mem. at 19. These protections– the substantive standard governing their secure placement and regular judicial review to ensure compliance with that standard– are not accorded to civil patients like the plaintiffs. Nevertheless, defendants contend that the New York statutory scheme does not violate plaintiffs' Equal Protection rights because (1) plaintiffs are not similarly situated to the NGRMDD patients who are accorded greater procedural

20

protections under New York law; and (2) there is a rational basis for any difference in the treatment of the two groups of patients.  Def. Mem. at 18-25.

In the first place, defendants have identified the wrong standard of review under which plaintiffs' Equal Protection claim must be evaluated.  As the Second Circuit explained in *Francis S. v. Stone*, 221 F.3d 100, 111-12 (2d Cir. 2000), based on its review of Supreme Court case law in this area, intermediate scrutiny is appropriate when considering the Equal Protection claims of involuntary psychiatric patients.[9]  The cases cited by defendants in support of their claim that only "rational basis review" should be applied– *Fetterusso v. State of New York*, 898 F.2d 322 (2d Cir. 1990); *Buthy v. Commissioner*, 818 F.2d 1046 (2d Cir. 1987); and *Charles W. v. Maul*, 214 F.3d 350 (2d Cir. 2000)– all pre-date the Second Circuit's decision in *Francis S.  See* Def. Mem. at 22.  Furthermore, *Francis S.* specifically considered each of the three cases relied upon by the defendants, as well as relevant Supreme Court decisions, in reaching its conclusion that "an intermediate level of scrutiny is appropriate" for equal protection claims in this area.  *Francis S.*, 221 F.3d at 111-12.

Secondly, the primary difference between plaintiffs and NGRMDD patients cited by the defendants is that the NGRMDD patients "are subject to continuing judicial oversight" during their time in OMH custody.  Def. Mem. at 19.  But it is precisely the lack of judicial oversight over their commitment to Kirby that plaintiffs' complaint objects to.  The lesser procedural protections accorded to plaintiffs cannot, in and of themselves, demonstrate that plaintiffs are not

---

[9]Defendants could hardly have been unaware of the *Francis S.* decision, as the Commissioner of OMH and the Director of Kirby were named defendants in that suit as well. Furthermore, their motion to dismiss cites to the state court decision in *Francis S.* which led to the federal habeas corpus decision cited above.  Def. Mem. at 21.

"similarly situated" to other patients at Kirby.

Furthermore, as defendants correctly point out, NGRMDD patients must be found guilty of every element of the crime charged prior to their admission to Kirby, while all criminal charges against plaintiffs have been dismissed and there has never been any finding that they engaged in criminal behavior.  Def. Mem. at 20-21.  "Equal protection does not require that all persons be dealt with identically, but it does require that the distinction made have some relevance to the purpose for which the classification is made."  *Baxstrom v. Herold*, 383 U.S. 107, 111 (1966). Thus, it is not enough for defendants to merely highlight this difference in the legal standing of members of the two groups; rather, defendants must also show that the fact that these plaintiffs were never convicted of any crime and that all criminal charges against them have been dropped is relevant to the state's decision to afford them fewer procedural safeguards than patients who were found guilty beyond a reasonable doubt of every element of the crimes with which they were charged.

Many cases have found that the distinction between insanity acquittees or NGRMDD patients, who have been found guilty of all elements of a given crime, and those found incompetent to stand trial, against whom no criminal charges have been adjudicated, is relevant for purposes of affording *fewer* procedural protections to the insanity acquittees.  For example, *Jones v. United States*, 463 U.S. 354, 364-65 (1983), involved an insanity acquittee's challenge to a state system that permitted him to be committed to a psychiatric institution without requiring the state to prove, as it would for a civil committee, that the patient was dangerous and mentally ill.  The Court reasoned that because the insanity acquittee had been found beyond a reasonable doubt to have committed criminal acts and had avoided criminal responsibility only by raising an

22

affirmative defense of mental disease or defect, the state was justified in presuming both mental

disability and dangerousness, and had no obligation to prove those elements beyond a reasonable

doubt. *Id.* at 365-66. It explained: "[T]he proof that he committed a criminal act as a result of

mental illness eliminates the risk that he is being committed for mere 'idiosyncratic behavior.'"

*Id.* at 366 (citation omitted).

Likewise, in *Buthy*, the Second Circuit explained that either "outstanding criminal

charges" or a finding of NGRMDD, which entails finding a defendant guilty of all of the

elements of a crime beyond a reasonable doubt, would be sufficiently indicative of

dangerousness to justify placement of such patients in more restrictive conditions.[10] *Buthy*, 818

F.2d 1046, 1049-50 (1987). But here, where all criminal charges against the plaintiffs have been

dropped (and were only misdemeanors or minor felonies to begin with, *see* Def. Mem. at 1), no

indicia of heightened dangerousness are present.[11] Notably absent is the critical link between the

differential classification and the purpose for which that classification is made.

Furthermore, even assuming that defendants' interests in security and avoiding additional

administrative burdens are sufficiently important to justify according fewer procedural safeguards

to these plaintiffs than to all other patients housed in secure psychiatric facilities, *see* Def. Mem.

---

[10]*Buthy* involved a challenge to the restrictive conditions in forensic psychiatric facilities, which were the precursor to the secure facilities now operated by OMH. C. ¶ 6.

[11]Although defendants assert that "Plaintiffs have a higher likelihood of dangerousness than other incapacitated criminal defendants," Def. Mem. at 24, this suggestion is simply implausible. Defendants themselves characterize the crimes that plaintiffs were originally charged with as "misdemeanors or minor felonies." Def. Mem. at 1. It is undisputed that all criminal charges against these plaintiffs have been dropped. *Id.*; C. ¶ 1. To assert that these plaintiffs are somehow more dangerous than, for example, a person found NGRMDD of murder or a person against whom rape charges remain outstanding strains credulity.

23

at 24, defendants still have not explained why they cannot afford these plaintiffs some post-deprivation procedural protections within the framework of the § 9.33 periodic retention hearings that they must hold in any case.  Such a solution would not infringe on defendants' asserted security interest, because no § 9.33 hearing is required prior to the patient's initial psychiatric commitment.  C. ¶¶ 14-17.  Nor would it impose an additional administrative burden, as the § 9.33 hearing, with its attendant protections, must be held in any case.

In short, defendants have cited no important state interest that would justify granting fewer procedural protections to involuntary civil psychiatric patients like the plaintiffs than to patients found beyond a reasonable doubt to have committed criminal acts.  This differential treatment states a claim for a violation of plaintiffs' Equal Protection rights, and defendants' motion to dismiss should accordingly be denied.

CONCLUSION

For the foregoing reasons, this Court should deny defendants' motion to dismiss for failure to state a claim, and should direct defendants to answer the plaintiffs' complaint, as provided pursuant to Fed. R. Civ. P. 12(a)(4)(A).

Dated: New York, New York
      February 3, 2005

                                        MARVIN BERNSTEIN, Director
                                        Mental Hygiene Legal Service, First Dept.
                                         S/
                                        _____
                                        By: SADIE ZEA ISHEE (SI-9540)
                                        Staff Attorney
SADIE ZEA ISHEE                         60 Madison Avenue, 2nd Floor
STEPHEN J. HARKAVY                New York, New York 10010
      of Counsel                       Phone:  (212) 779-1734

_____

24