UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
:
MARVIN BERNSTEIN, Director, Mental Hygiene :
Legal Service, First Judicial Department, and :
MICHAEL B., EUGENE C., and EDDIE L., :
patients at Kirby Forensic Psychiatric Facility, on :
behalf of themselves and on behalf of all others :
similarly situated, :
:
                    Plaintiffs, :
:      05 Civ. 1322 (GEL)
   -against- :
:      **OPINION AND ORDER**
:
GEORGE E. PATAKI, in his official capacity as :
Governor of the State of New York, SHARON :
CARPINELLO, in her official capacity as :
Commissioner of the New York State Office of :
Mental Health, and EILEEN CONSILVIO, in her :
official capacity as Director of Kirby Forensic :
Psychiatric Facility, :
:
                    Defendants. :
:
------------------------------------------------------------x

Marvin Bernstein, Director, Mental Hygiene Legal Service, First Department, New York, New York (Stephen J. Harkavy and Sadie Zea Ishee, of counsel), for Plaintiffs.

Eliot Spitzer, Attorney General for the State of New York, New York, New York (Edward J. Curtis and Jamila Berridge, Assistant Attorneys General), for Defendants.

GERARD E. LYNCH, District Judge:

      Plaintiffs Michael B., Eugene C., and Eddie L. are involuntarily-committed psychiatric

patients who, at the time the Complaint was filed, resided at Kirby Forensic Psychiatric Facility

("Kirby"), a maximum-security psychiatric facility operated by the New York State Office of

Mental Health ("OMH"). In this putative class action, plaintiffs, who were committed after being found incompetent to stand trial, claim that New York law violates their due process and equal protection rights (and those of patients similarly situated) because it permits them to be housed at Kirby (as opposed to a less restrictive, non-secure hospital) without a judicial hearing on whether they suffer from a dangerous mental disorder warranting such retention. Defendants move to dismiss the Complaint, while plaintiffs move to certify a class of similarly-situated patients. The motion to dismiss will be granted; plaintiffs' class-certification motion will be denied as moot.[1]

## BACKGROUND

The following facts are drawn largely from the Complaint, the allegations of which are taken as true for the purposes of ruling on defendants' motion to dismiss. E.g., Kopec v. Coughlin, 922 F.2d 152, 153 (2d Cir. 1991). Plaintiffs were placed at Kirby at the direction of OMH after being found unfit to stand trial on criminal charges for misdemeanors or low-level felonies. (Pl.'s Mem. Supp. Mot. Dismiss at 1.) Kirby is a secure facility that, according to plaintiffs, is "significantly more restrictive" than other "non-secure" treatment facilities operated

---

[1] In a letter dated October 5, 2005, plaintiffs informed the court that Michael B. and Eugene C. had been transferred, in the exercise of OMH's discretion, from Kirby to less secure psychiatric facilities. The controversy nonetheless very likely remains live as to them. As the New York Court of Appeals observed in Aliza K. v. Ford, New York law "contemplates that involuntary hospitalization in a mental health facility is often brief and temporary. [The Mental Hygiene Law] and its implementing regulations require frequent periodic review of a patient's status, and the release of the patient unless OMH is granted successive court orders authorizing retention." 92 N.Y.2d 500, 505-06 (1998). A patient's retention in a secure facility thus would appear to be a practice that is "capable of repetition, yet evading review," a well-recognized exception to mootness. See Sosna v. Iowa, 419 U.S. 393, 399-403 (1975). It is unnecessary to resolve the question, however, as Eddie L.'s continuing presence at Kirby defeats any claim of mootness.

by OMH; it is "intended for the confinement of the most dangerous individuals within the New York mental health system." (Compl ¶ 6-9.)[2] The decision whether a patient will be placed and retained in a secure facility such as Kirby is committed to OMH's discretion. See N.Y. Crim. Proc. L. § 730.40(1); (Compl. ¶¶ 7, 9, 11, 12).

The statutory and regulatory scheme operates as follows: When a criminal defendant facing misdemeanor or minor felony charges is declared incompetent to stand trial, he is placed in OMH's custody "for care and treatment in an appropriate institution," Crim. Proc. L. § 730.40(1); within 24 hours, OMH designates the facility to which the person will be committed. (Compl. ¶¶ 11-12.) The criminal charges against the defendant are thereafter dropped. See Crim Proc. L. § 730.40(1)-(2). In order for the individual to be involuntarily retained for more than 90 days after being placed in OMH custody, the individual, pursuant to N.Y. Mental Hygiene Law § 9.33, must be found to be mentally ill and in need of involuntary care and treatment, issues on which the individual is entitled to a judicial hearing. See id. § 730.40(1)-(2); N.Y. Mental Hyg. L. §§ 9.27, 9.33; (Compl. ¶ 14-17). An initial section 9.33 commitment is valid for up to one year; the director of the hospital in which the patient is housed may make subsequent section 9.33 applications to extend the commitment for an additional two years at a time. Id. § 9.33(d).

The Mental Hygiene Law does not direct where the patient should be housed if retention is found to be warranted. (Compl. ¶ 17.) Addressing this statutory silence, the First Department in Consilvio v. Michael B. held that a court authorizing retention of an individual under section

---

[2] The Complaint fails to explain the ways in which secure facilities such as Kirby are more restrictive than non-secure facilities, except to say that "[p]atients in secure facilities are subject to greater physical restraints, regardless of their behavior, than patients in non-secure facilities." (Compl. ¶ 7.)

9.33 lacks the authority to review OMH's decision to hold an individual in a secure facility. 764 N.Y.S.2d 12, 13 (1st Dep't 2003). The sole mechanism by which a patient may obtain judicial review of his placement in such a facility, the court held, is through an Article 78 challenge to OMH's denial of a transfer application filed pursuant to 14 N.Y.C.R.R. § 517.4. Michael B., 764 N.Y.S.2d at 13-14. While section 517.4 specifies various procedural requirements to which OMH must adhere and factors that OMH should consider in reviewing a transfer application, the ultimate decision to grant or deny such an application is left to OMH's discretion. Cf. In re Jerome G., 607 N.Y.S.2d 709, 710 (2d Dep't 1994) (holding that once the retention of an individual is authorized under section 9.33, "the decision as to which facility is appropriate is left to the discretion of the Commissioner of the New York State Office of Mental Health"). The denial of a transfer application can be vacated or reversed by an Article 78 court only upon a showing that OMH's decision was arbitrary and capricious, an abuse of discretion, or tainted by legal error. See N.Y. C.P.L.R. § 7803(3).

Plaintiffs, unsatisfied with this limited opportunity for judicial review, urge that a hearing at which OMH must prove to a court that an individual suffers from a dangerous mental disorder warranting retention in a secure facility is necessary to satisfy the requirements of the Due Process and Equal Protection Clauses of the Fifth and Fourteenth Amendments to the United States Constitution. (Pl.'s Mem. Opp. Mot. Dismiss at 3-4.)[3]

---

[3] Plaintiffs do not claim an entitlement to a pre-placement hearing, but only a judicial determination of dangerousness at the periodic hearings provided for by MHL § 9.33. (Pl.'s Mem. Opp. Mot. Dismiss at 16-17.)

**DISCUSSION**

I.  Procedural Due Process

Plaintiffs' first claim is that their retention at Kirby without a hearing on the issue of dangerousness deprives them of liberty without due process of law.  To state a procedural due process claim, plaintiffs must sufficiently allege (1) that they possess a protected liberty interest, and (2) that defendants deprived them of that interest without providing adequate process.  Velez v. Levy, 401 F.3d 75, 87 (2d Cir. 2004).  Because plaintiffs lack a protected liberty interest, this claim will be rejected.

While it is undisputed that an individual has a protected liberty interest in freedom from involuntary commitment, see Vitek v. Jones, 445 U.S. 480, 491-92 (1980); O'Connor v. Donaldson, 422 U.S. 563, 573-76 (1975), plaintiffs do not challenge the procedures that led to their commitment.  Rather, they challenge the manner of their treatment, specifically their retention at Kirby without the opportunity to secure a judicial determination on the issue of their dangerousness.  In Meachum v. Fano, the Supreme Court addressed an identical claim in the prison context and held that a criminal conviction "sufficiently extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons," even though "the degree of confinement in one prison may be quite different from that in another[.]"  427 U.S. 215, 224 (1976) (emphasis in original).  The Court reasoned that

> [c]onfinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose. That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules. . . . To hold, as we are urged to, that *any* substantial deprivation imposed by prison authorities triggers the procedural protections of the Due

5

> Process Clause would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts. . . . Transfers between institutions, for example, are made for a variety of reasons and often involve no more than informed predictions as to what would best serve institutional security or the safety and welfare of the inmate. Yet under the approach urged here, any transfer, for whatever reason, would require a hearing as long as it could be said that the transfer would place the prisoner in substantially more burdensome conditions than that he had been experiencing.

Id. at 225. While there are significant differences between the situation of a civilly-committed individual and convicted criminal subject to a sentence of imprisonment, Meachum's rationale is nonetheless persuasive in this context. Thus, it is unsurprising that (as plaintiffs concede) the Second Circuit has rejected the notion that a civilly-committed patient has a protected liberty interest in being confined in the "least-restrictive" treatment environment. (Pl.'s Mem. Opp. Mot. Dismiss at 8 n.4). See, e.g., Kulak v. City of New York, 88 F.3d 63, 73 (2d Cir. 1996). That being the case, plaintiffs cannot claim a protected interest in not being retained at a secure facility, and thus are not entitled to a judicial hearing on the propriety of that retention.

Plaintiffs' first response is that Meachum is inapplicable outside of the post-criminal conviction context. See Benjamin v. Fraser, 264 F.3d 175, 188-90 (2d Cir. 2001) (holding Meachum inapplicable to pre-trial detainees). Notwithstanding the Second Circuit's decision in Fraser, Kulak's rejection of a right to a "least restrictive" treatment environment in this context is dispositive. In any event, while plaintiffs (like the plaintiffs in Fraser) have not been convicted of any crime, they have been validly committed (unlike the Fraser plaintiffs) pursuant

to the procedures set forth in Crim. Proc. L. § 730.40 and MHL Article 9. (Compl. ¶¶ 28-39.).[4]
Just as a conviction extinguishes a prisoner's right to be housed in a less-secure prison, civil commitment extinguishes a patient's liberty interest in being housed in a less-secure psychiatric facility.

Plaintiffs' primary response is to argue that notwithstanding cases such as Meachum and Kulak, where (as here) "a state has created a two-tiered system for housing its mentally ill, with one tier entailing substantially greater restrictions on a patient's liberty that the other, a liberty interest arises in being confined in the less-restrictive setting." (Pl.'s Mem. Opp. Mot. Dismiss at 8 n.4.) According to plaintiffs, this right derives from the interest in "freedom from undue bodily restraint" recognized in the Supreme Court's decision in Youngberg v. Romeo, 457 U.S. 307 (1982). This argument is meritless. As an initial matter, the right to treatment in the "least restrictive setting appropriate to the patient's medical needs and treatment goals," (Pl.'s Mem. Opp. Mot. Dismiss at 8 n.4), itself presumes the existence and availability of some "less restrictive setting" than that which the complaining party currently occupies; as noted above, plaintiffs concede that this right was rejected by the Second Circuit in Kulak. Plaintiffs' argument that such a right nonetheless exists any time a "substantially" less-restrictive alternative to current treatment is available all but nullifies the Second Circuit's holding. More basically, plaintiffs misconstrue the nature of the liberty interest recognized in Romeo. In that

---

[4] At the time the Complaint was filed, Eugene L.'s initial 90-day retention under Crim. Proc. L. § 730.40 had not yet expired, and he had not yet been committed pursuant to the requirements of MHL Article 9. In a letter dated October 5, 2005, plaintiffs advised the Court that Eugene L. was still being retained at Kirby. Because Eugene L.'s continuing retention would be authorized only if defendants complied with the requirements of MHL Article 9, it is assumed for purposes of this opinion that they have done so.

case, the Supreme Court indeed held that the fact that an individual has been civilly committed under proper procedures "does not deprive him of all substantive liberty interests under the Fourteenth Amendment." Id. at 315. And the Court did go on to hold that a patient "retain[s] liberty interests in safety and freedom from bodily restraint." Id. at 319. However, the Court cabined the interest in freedom from bodily restraint, holding that it extends only to those restraints *unsupported by professional judgment*. Specifically, the Court held that the decision to impose greater physical restraints in a treatment setting, "if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." Id. at 323. Plaintiffs' claims do not implicate *that* liberty interest – plaintiffs do not attack the substance of OMH's decisions to retain them at Kirby, let alone claim that they were a "substantial departure from accepted professional judgment, practice, or standards," but rather claim only an entitlement to a judicial hearing on the propriety of their retention. In fact, they explicitly state that their "complaint is not with any particular executive action; they do not complain that OMH or any of its officers acted arbitrarily in assigning any particular patient to Kirby rather than a non-secure facility." (Pl.'s Mem. Opp. Mot. Dismiss at 18.)[5]

---

[5] Plaintiffs point out that the New York Court of Appeals, in Aliza K. v. Ford, held that a protected liberty interest is implicated by OMH's transfer of a civilly-committed patient from a non-secure to a secure facility. 92 N.Y.2d 500, 507 (1998). As an initial matter, the Court of Appeals' application of federal constitutional principles to state law is not binding on this Court. See, e.g., Hurwitz v. Sher, 789 F. Supp. 134, 138 (S.D.N.Y. 1992). In any event, it is not entirely clear whether the liberty interest in Aliza K. was based solely on the greater restrictiveness and stigma associated with retention at a secure facility, see 92 N.Y.2d at 506-07, or whether the Court was influenced by the fact that the transfer of an individual from a non-secure to secure facility is governed by specific regulatory procedures and substantive factors

Plaintiffs next claim that even if no liberty interest deriving from federal constitutional principles is implicated in this context, New York state law does create such an interest. In Rodriguez v. McLoughlin, the Second Circuit explained that a state may create a liberty interest that would not otherwise be protected by the Due Process Clause, but that such an interest may only be recognized in certain limited instances:

> Mere expectations do not necessarily give rise to a state-created liberty interest protected by the Due Process Clause. "[A] State creates a protected liberty interest by placing substantive limitations on official discretion." Dep't of Corrections v. Thompson, 490 U.S. at 462, quoting Olim v. Wakinekona, 461 U.S. 238, 249 (1983). "The most common manner in which a State creates a liberty interest is by establishing 'substantive predicates' to govern official decisionmaking . . . and, further, by mandating the outcome to be reached upon a finding that the relevant criteria have been met." Thompson, 490 U.S. at 462, quoting Hewitt v. Helms, 459 U.S. at 472 ("specified substantive predicates"). To create a liberty interest, a statute or regulation must "contain 'explicitly mandatory language,' i.e., specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." Thompson, 490 U.S. at 463, quoting Hewitt, 459 U.S. at 472.

214 F.3d 328, 338 (2d Cir. 2000). Plaintiffs do not claim that any "explicitly mandatory language" guides OMH in the retention of patients in secure versus nonsecure facilities. Nevertheless, plaintiffs point to language in 14 N.Y.C.R.R. § 36.1, which states:

> § 36.1  Statement of philosophy
>
> The long-term rehabilitation of mentally disabled persons is promoted by maintenance of relationships with other persons and agencies in the community, avoidance of institutionalization, and minimization of disruption of life rhythms. *The civil rights of*

---

that must be satisfied – unlike the largely unfettered decision to retain an individual in a secure or non-secure facility as an original matter – which provides a stronger claim to a *state-created* liberty interest, id. at 506.

> *mentally disabled persons require that such persons be treated and served in the least restrictive setting possible in which treatment or service goals can be met.* Therefore, periods of inpatient service should be as short as possible in accordance with the individual patient's plan of care and treatment. This philosophy will, in many cases, require continued service to a patient on an outpatient basis at the conclusion of inpatient service.

(Emphasis added.)  (Pl.'s Mem. Opp. Mot. Dismiss at 9-10.)

Although the Seventh Circuit in Johnson v. Breljie, 701 F.2d 1201, 1205 (7th Cir. 1983), found similar language to create a liberty interest in not being retained in a maximum-security facility, under Rodriguez, the abstract "[s]tatement of philosophy" that persons shall be treated in the least restrictive setting possible does not itself create any particular due process right.  First, section 36.1 itself spells out the consequences of the statement of philosophy, and states only that "periods of inpatient service should be as short as possible in accordance with the individual patient's plan of care and treatment," not that patients have a right to be housed in any particular type of facility during the tenure of their commitment.  Second, the regulation does not discuss any particular decision, commitment procedure, or aspect of patient care, let alone provide "specific directives to the decisionmaker" that, with respect to some specific treatment decision, "a particular outcome must follow" if the regulation's "substantive predicates are present." Rodriguez, 214 F.3d at 338.[6]  Finally, if this general language did give rise to a state-created liberty interest, then *each and every* specific treatment decision made by OMH that arguably has some nexus to the restrictiveness of a patient's care would be ripe for procedural due process challenge.  For these reasons, section 36.1 does not give rise to a state-created liberty interest

---

[6] The statement of philosophy in section 36.1 gains no added significance due to the fact that MHL § 7.07(c) generally directs OMH to adequately protect "the personal and civil rights of persons receiving care, treatment, and rehabilitation."

protected by the Due Process Clause.[7]

Patients in plaintiffs' situation are not completely without due process protection regarding their retention in a secure psychiatric facility. If, for instance, it could be argued that the retention of a patient in a secure facility is unsupportable as a matter of professional judgment, that decision would run afoul of the interest in freedom from bodily restraint recognized in Romeo. In addition, under Vitek v. Jones, if the individual's placement in a particular secure facility is "not within the range of conditions of confinement" to which involuntary commitment subjects an individual, a right to a due process hearing prior to such placement may be warranted. 445 U.S. at 492-94 (holding that criminal conviction does not authorize involuntary psychiatric treatment without pre-deprivation process). Plaintiffs, however, do not claim that either of these conditions applies to them. Accordingly, their claim to a hearing on the appropriateness of their continued placement at Kirby must fail.

II.     Substantive Due Process

Plaintiffs also claim that by failing "to provide any substantive standard to determine whether plaintiffs will be placed in a secure or non-secure facility," (Compl. ¶ 53), and by not requiring that defendants "prove that secure detention is necessary to the treatment goals underlying plaintiffs' detention" (Pl.'s Mem. Opp. Mot. Dismiss at 18), New York has violated their substantive due process rights. In essence, plaintiffs claim that because New York's legislative and regulatory scheme violates the procedural aspects of the Due Process Clause, it necessarily also violates its substantive aspects. Since the procedural due process predicate is

---

[7] As noted above, plaintiffs do not argue that a state-created liberty interest arises by virtue of the transfer procedures found to apply to patients in plaintiffs' situation by the Appellate Division in Michael B. (Pl.'s Mem. Opp. Mot. Dismiss at 9-12).

incorrect, this claim is without merit.

In any event, while plaintiffs attack the lawfulness of the procedures governing their retention at Kirby, they do not challenge the fact of retention itself; or rather, they make no claim that assuming procedural sufficiency, their retention at Kirby is nevertheless constitutionally impermissible. See Pl.'s Mem. Opp. Mot. Dismiss at 18 (stating that plaintiffs' "complaint is not with any particular executive action; they do not complain that OMH or any of its officers acted arbitrarily in assigning any particular patient to Kirby rather than a non-secure facility"). Plaintiffs' argument is thus a procedural due process challenge, not a substantive one.  As the First Circuit observed in Amsden v. Moran, in contrast to a procedural due process claim, "a substantive due process claim implicates the essence of state action rather than its modalities; such a claim rests not on perceived procedural deficiencies but on the idea that the government's conduct, regardless of procedural swaddling, was in itself impermissible." 904 F.2d 748, 753 (1st Cir. 1990); see also Collins v. City of Shaker Heights, 503 U.S. 115, 123 (1992) (substantive aspects of Due Process Clause protect against "certain government actions *regardless of the fairness of the procedures used to implement them*" (emphasis added and quotation omitted)). That is not to say that plaintiffs could not raise a substantive due process challenge to their retention at Kirby, for instance, under the Supreme Court's decision in Romeo, discussed above. It is simply to say that plaintiffs have not asserted such a claim in this case.   What plaintiffs label a substantive due process claim is in reality merely a restated claim to enhanced procedural protections.

III.  Equal Protection

Finally, plaintiffs assert that the differential treatment accorded to patients like plaintiffs, committed after being found incompetent to stand trial on criminal charges, see Crim. Proc. L. § 730.40, and to patients committed after being found not guilty be reason of mental disease or defect ("insanity acquitees"), see id. § 330.20, violates the Equal Protection Clause. Specifically, plaintiffs point out that under section 330.20, prior to an insanity acquitee's commitment, the district attorney must prove to a court that the individual suffers from a dangerous mental disorder[8] and is mentally ill.  Id. § 330.20(6).  If the court determines that the individual suffers from a dangerous mental disorder, then the court must issue a commitment order and place the individual in a secure psychiatric facility like Kirby; otherwise, if the court determines that the individual is mentally ill but does not suffer from a dangerous mental disorder, placement in a non-secure facility is directed.  Id. § 330.20(1)(f), (6)-(7).  The court reviews the commitment of those individuals periodically, and each time the district attorney must satisfy the court that the individual continues to suffer from a dangerous mental disorder in order for the defendant to be further detained at a secure facility.  Id. § 330.20(8)-(9).  Plaintiffs argue that their retention in Kirby should be subject to this kind of judicial oversight.  The Court disagrees.  First, the parties disagree as to the applicable standard of review.  Plaintiffs argue that intermediate scrutiny applies, relying on Francis S. v. Stone, 221 F.3d 100, 111-12 (2d Cir. 2000) (intermediate scrutiny of differing re-commitment procedures for insanity acquittees and other civilly-committed patients), while defendants argue that rational basis scrutiny applies,

---

[8] "Dangerous mental disorder" is defined, in a nutshell, as a mental illness that renders an individual "a physical danger to himself or others." Crim. Proc. L. § 330.20(1)(c).

13

relying on, inter alia, Fetterusso v. State of New York, 898 F.2d 322 (2d Cir. 1990) (rational basis scrutiny of state's practice of billing insanity acquittees but not other civilly-committed patients) and Buthy v. Commissioner, 818 F.2d 1046 (2d Cir. 1987) (rational basis scrutiny of differing hospital restrictions for insanity acquittees versus other civilly-committed patients). While in Francis S. the Second Circuit did apply intermediate scrutiny to an equal protection claim premised on the differential treatment of insanity acquittees and other civilly-committed individuals, the Court's decision found that increased scrutiny was warranted there because the fact of commitment – which generally draws greater judicial scrutiny – was itself challenged. 221 F.3d at 112. Indeed, in distinguishing Buthy, which applied a rational-basis standard, the Court described Buthy as involving an equal protection claim that did not challenge the "fact of commitment." Id. As in Buthy, the challenge here is not to the fact or manner of commitment, but rather to the procedures by which a committed individual can be retained at a secure facility. That claim is subject to rational basis scrutiny under Buthy and its progeny.

Applying rational-basis standard of review, it is clear that the distinction in New York's legislative scheme is "rationally related to a legitimate state interest." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439-40 (1985); see also Heller v. Doe, 509 U.S. 312, 320 (1993) (classification under rational-basis scrutiny "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for classification" (quotation omitted)). The Second Circuit has previously noted that insanity acquittees "have been found beyond a reasonable doubt to have committed criminal acts, a finding that in itself 'certainly indicates dangerousness.'" Buthy, 818 F.2d at 1049, quoting Jones v. United States, 463 U.S. 354, 364 (1983). Patients, such as plaintiffs, committed after

being found incompetent to stand trial, have not similarly been found to have committed any criminal act, and thus are not subject to the same heightened presumption of dangerousness. For this reason, the commitment of insanity acquittees is subject to increased judicial oversight for the protection of the public, including requirements that a patient *must* be retained in a secure facility upon a court's finding of dangerousness (OMH has no authority to place the individual in a non-secure facility instead), see Crim. Proc. L. § 330.20(6), that such a patient cannot be furloughed, transferred, released, or discharged without a court's express authorization, see id. § 330.20(10)-(13), that any transfer or release must be accompanied by a court order specifying conditions on such transfer or release, id. § 330.20(11)-(12), and that a patient can only be finally discharged by a court, once he "has been continuously on an out-patient status for three years or more pursuant to a release order[.]" Id. § 330.20(13). On the other hand, defendants claim, and plaintiffs do not dispute, that under New York law, patients in plaintiffs' situation "may be placed on less restrictive status, transferred to a different hospital, or released at the discretion of [OMH], without judicial oversight[.]" (Def.'s Mem. Supp. Mot. Dismiss at 23, citing MHL § 29.15).

       Plaintiffs characterize this greater judicial oversight as a boon to insanity acquittees seeking retention in a less-secure facility, but it also presents additional hurdles to overcome before an insanity acquittee can be placed in a less-restrictive setting, furloughed, or released. While plaintiffs would like to ignore the potentially *greater* restrictiveness of the scheme governing retention of insanity acquittees, the question whether the Legislature rationally enacted such a scheme without making the law governing other civilly-committed patients

symmetrical depends on an analysis of both the bitter and the sweet.[9] For these reasons, plaintiffs' equal protection challenge fails. Cf. Aliza K., 92 N.Y.2d at 50 (concluding that because of differences between insanity acquitees and those committed after being found incompetent to stand trial, classifications raising "different legal concerns," "a rational basis exists for having different procedures to determine the appropriateness of transfer decisions").

## CONCLUSION

Since plaintiffs have failed to identify a constitutional defect in the challenged procedures, defendants' motion to dismiss is granted, and plaintiffs' motion for class certification is denied as moot.

SO ORDERED.

Dated: New York, New York
      December 13, 2005

                                    GERARD E. LYNCH
                                    United States District Judge

---

[9] Even if a judicial hearing would often, or even almost always, work to the advantage of a patient seeking transfer or release, rational basis review demands only that some "reasonably conceivable state of facts [can] provide a rational basis" for the Legislature's differential treatment of plaintiffs. Heller, 509 U.S. at 320.